Each side has 10 minutes now. Good morning. Good morning, Your Honor. Did I understand correctly that our time is cut from 20 to 10 minutes? 20 to 10. You got it. Okay, I would ask the clerk if I could be advised when I have three minutes left I'd like to reserve. 30 seconds left? Three minutes. Three minutes, I'm sure. Okay. If you may please the court, Randall Weans on behalf of plaintiff Rick Mejia. Mr. Mejia is here with me in the courtroom. Morning. I introduce him to the court not just for the normal formalities but for an actual factual reason that comes up in the case. As the court is well aware this was a mix-up in an execution of an arrest warrant. Mr. Mejia, 34 years old at the time, was treated to the treatment he received. They were looking for a 60-year-old man with long gray hair and a ponytail down his back. They did a very simple thing to at least check the IDs and the descriptions. One of the defendants, Flight Admitted, never, quote, it never occurred to them to do that. The Fourth Amendment being one of the most precious rights we enjoy. When would they have seen that he didn't have a ponytail? Pardon? When would they have seen that? As soon as they opened the door. So they. When he had his hands up with his palms facing the officer in his undershorts. Okay, but that's, they're already in the house. So are you saying then they had the right to go into the house and they should have immediately. No. I'm saying for all the reasons in my brief, and I'll repeat any of them the court has questions about, they had no business in that house. They disregarded time and time and time again their own mandatory, quote, mandatory requirements of their own search manual. I mean, if you're going to have a search manual, then you're going to either ignore it or disregard it or a number of the defendants claim they were never even trained on it. Counsel, I want you to assume for the purpose of my question that the officers had, whether they were clearly wrong, but that they had probable cause to come into the house and that they reasonably believed that there was a person there who had in the past been armed and dangerous. I want you to assume that even though I know you don't agree with it. With that assumption, once they entered the house and could see that Mr. Mejia was unarmed and in fact undressed and determined that he was the wrong person and not the person they were looking for, what was the period of time that process took? Was it 30 seconds, a minute and a half, five minutes? And the reason for my question is I'm trying to understand a little bit better the details of the timeline, whether the things that happened, happened over a long enough period of time that it was clearly unreasonable to have continued the defendant's activity. Okay. If I can recall the questions and I hope I get... I'm looking for a timeline once they're in the house. That's basically what I'm looking for. They kicked in his door, which the force of which propelled him across the room. They immediately had him on the ground, a shotgun to the head and two pistols to the sides of his head. Okay. And then they figure out he's the wrong guy. No. They keep him there. There's not an exact time frame, but the evidence, and I cited the quote, I don't have the exact citation, was between five and ten minutes they kept him that way, face down, handcuffed behind his back, somebody sitting on his back with gun barrels to his head. Do they still have the guns pointing when he was handcuffed? Pardon? Do they still have the guns pointing at his head when he was handcuffed? As far as I know, they did. I'm not sure. At least there's test... Is there evidence in the record from which someone could so find? Yes, I believe there was. But the excessive force, the pointing the guns to the head is just the most outrageous part of the excessive force. I mean, being sat on with your hands behind your back and somebody grabbing your neck and handcuffed behind your back, face down on the floor for five to ten minutes when they obviously had the wrong person and all they had to do was what eventually was done. An officer walks in from the outside and says, oh, we ran a license plate check on the cars. It belonged to Mr. Mejia. We got the wrong place. What kept them from doing that ten minutes before? Well, that wouldn't necessarily have told them that it wasn't. I mean, there are other people who park their cars out in front of my house and it's still my house. I don't understand how that would have prevented the entry. Because, for one thing, that's required by the defendant's search warrant. That doesn't actually answer my question. The fact that they would have found someone else parked in front of this house would not necessarily have told them that the person they were looking for wasn't also there, would it? And that's the tragedy of this case. If there was one such factor, independently, it would have not shown that. I agree. But those are factors to be considered and factors are mandated by the search manual. Search the house records. They didn't do that. They had Mr. Mejia was head on the house for a year. Check the utility records. If it says not only check, you have to recheck them 24 hours before your planned entry. They were all in Mr. Mejia's name. They disregarded that mandatory provision. They're supposed to do some type of surveillance or walk-arounds, check vehicles on the premises, which are indicia, additional indicia, whether or not it's more or less probable that the target you're looking for, in this case Mr. Marty, was either resided at or at the premises. They disregarded that one. They never talked to the neighbors. They had no indication whatsoever that he was there. In fact, ironically, their own PF2 printout showed that Marty actually resided at 3940 U Street, whereas Mr. Mejia's was at 6805 San Joaquin Street. So some of their own information told them that Mr. Marty was not at this address. And rather than say, well, now we've got a discrepancy. He used to be here. Now we have information that says he's no longer here. It seems to me it's reasonably incumbent upon the defendants to take some additional steps, such as checking the records and the ownership and the utility records, the license plates. In fact, one of the defendants testified, and I think the expert witness, that checking the license plates is a normal thing you do because it's another indicia. It's not conclusive, obviously, but it goes on the scale. Is it more or less probable that Marty was physically present when none of the vehicles are registered to him? And I cited a case that had to do with that reasonableness. I think it's the U.S. Harper case where the police had placed under surveillance for several weeks, knew that members of the defendant or the person they were after, Harper's family lived there. His two brothers lived there. They saw, physically observed Harper entering with his own key the target residence. You're at the 3-minute mark in case you wanted to pay attention. In that case, the Court, this Court, Ninth Circuit, said that was, what was the word, just barely, close quote, sufficient to establish probable cause that the target was present. If that – if the Harper case is just barely sufficient, we have – we're way on the other side of Harper. And it seems to me this Court is going to have to move their own goal lines a considerable distance if they're going to recognize the validity and the wisdom of the Harper rationale and decision, and yet hold, if that was just barely, that this was in the ballpark. I think they're not even close. Thank you very much, sir. Well, I'll take it. Is there anyone else? Go ahead. And on the gun issue, that is the most outrageous thing. And this – again, this decision in Robinson v. Solano County rendered a year, more than a year, in 2001 – 2000, and this happened, our incident in 2001, clearly said you can't – it's inherently unreasonable to hold guns, even from a distance, in that case, of six to three or four feet at a suspect's head, unless you have, you know, escape, evasion. I'm not clear they – I mean, you may be right about the record. We'll go back and he was handcuffed and subdued. If you can – if you can aim us, if you want, while you're – while you're – Well, I probably won't be able to find that line. The record will have to speak for itself. My reason is they should have never pointed guns to a nearly naked man with his hands in the air, palms facing outward, unanimous testimony by the police department. I mean, what did they think? He was secreting a shotgun in his undershorts? At some point – Well, who knows what was in there? I don't know. I mean, reasonableness has to come into it. That's the whole standard. It's a reasonable cause. And I don't think there was anything reasonable about the defense conduct in this case. Okay. Thanks very much. Morning. Good morning, Your Honors. Jonathan Paul on behalf of the County of Sacramento and its individual defendants. I would like to reserve five minutes at the outset for Mr. Wilson on behalf of the City Attorney's Office. I believe he'll be addressing some arguments, which I will not. To begin with, I'd like to focus this Court's attention on the fact that plaintiff needs to establish individual liability against the deputy probation officers. As plaintiff has just said, he keeps referring to the defendants as the defendants, and they violated the right to excessive force or they caused excessive force upon the appellant. We need to look at what the individual deputy probation officers did in this case. And I pointed this out in my brief that no probation officer, it is clear from the record, pointed a weapon at plaintiff or even physically touched plaintiff. And therefore, there can be no finding of excessive force against the deputy probation officers in the case. Who had the guns? The record is clear that it was the Sacramento Police Department officers that pointed the guns at plaintiff. And they are no longer defendants? Mr. Wilson represents those individuals. Okay. There. All right. Okay. Then my questions really are for him, unless you want to answer the question I asked opposing counsel. Even giving everybody the benefit of the doubt up until the moment of entry, there was evidence that the subduing of Mr. Mejia forcibly lasted five minutes or more. And my question is, why isn't that too long to determine that he's the wrong person? I think there's some conflict here as to what occurred inside the residence. My understanding of the record, and I believe Mr. Wilson could speak to this more accurately, given that it involves his clients, is that Mr. Mejia, and the appellant has made the point that Mr. Mejia does not match the physical description of Mr. Marty. Well, that's a bit of a red herring because the fact that he doesn't match the description doesn't really relate to the fact that Albert Marty could be in some other room of this house. And when the officers entered, they have no idea of who Mr. Mejia is. The reason the officers raised their weapons at Mr. Mejia is because they stated they could not see his hands. And then they detained him. Once they had him handcuffed and detained, the safest place for Mr. Mejia while the search was going on in the home for Mr. Marty was in the living room, was down on the ground in case any shots were fired. Why isn't that a jury argument? I mean, you've already started your answer to me by saying there's a conflict in the record. There's conflicting evidence about what happened in the house. Why isn't that for a jury? Well, perhaps I misspoke. I don't think there's a conflict in the record. I think it's clear from the record that Mr. Mejia was placed on the ground, that an officer kept him on the ground while the search was conducted. As soon as the house was cleared, the protective sweep was cleared. It's my understanding that Mr. Mejia was allowed to get up off the ground and then they confirmed that he was not Mr. Marty. Well, why didn't they start by confirming that he wasn't the person they were looking for? Well, Judge, just because the individual who answers the doors, not the suspect for whom they have the arrest warrant, does not mean the officers weren't entitled to go look for other occupants of the home to determine whether or not they could find Mr. Marty. The safest place for Mr. Mejia was on the ground. So they sat on him and pointed a gun at him for his own good? Is that what your argument is? No. My argument is that, and I believe Mr. Wilson can probably better address this, is that once it was determined that Mr. Mejia was not a threat, the officers did no longer point their weapons at him. When did they determine that? I believe when they saw his hands and once they had him on the ground. That was the question I was trying to get at with counsel. Did they put the guns away as soon as he was handcuffed and on the ground, or did they keep it pointed at him during the entire episode? I do not believe they kept them pointed at him. I believe once he was detained and handcuffed, the guns were holstered. In fact, I can speak for the deputy probation officers directly. When Officer Florence and Officer McGowan entered the residence, they had their guns holstered and they noted in their testimony that all the other individuals inside the residence had their sidearms holstered. Did you want to pass the baton, or do you have something? Yes, I would like to pass the baton at this time. I would like to emphasize for the court that I submitted a Rule 28 letter advising the court of the Motley v. Parks decision. I wanted to highlight in there that the deputy probation officers in this case are much like the line officers in the Motley case. They were here providing backup support for a Sacramento Police Department operation. I would ask that this court keep that in mind in ruling on those individual defendants. Thank you very much. Thank you. For the city. Good morning, Your Honor. James Wilson for the city and its employee defendants. If I could address myself to the question that was initially pending with regard to the pointing of weapons, the portion of the record that documents that indicates that, first of all, that Defendant Hinn, who is one of our employees, said that she pointed a handgun at Mr. Mejia. That's at AER 486. As soon as she saw both of Mr. Mejia's hands and confirmed that he was not armed, she holstered her sidearm and moved around behind him in applied handcuffs. Okay, that's one person. What about the others? Okay. Defendant Oliver was another police officer for the city, came in the door with a shotgun and did indeed point the shotgun at Mr. Mejia as he entered the building. That's at AER 174. He lowered the shotgun as soon as Defendant Hinn made physical contact with Mr. Mejia. That's at AER 1032. Defendant Oliver had his shotgun pointed at Mejia for an estimated three or four seconds. That's at AER 277 and 278. As a result, the only evidence extant in the case with regard to how long firearms were pointed at Mr. Mejia is that they were pointed at him for a period of about three or four seconds. What was his testimony? He said they pointed guns at him and knocked him on the ground and never put a time on it at all. Now, it is true that Mr. Mejia was kept on the ground for a period of time after weapons were no longer brought to bear on him. That was during the remainder of the protective sweep of the house to see if Mr. Marty or anybody else was concealed in some other portion of the house. How long did they sit on him? The officers didn't put a time frame on it, Your Honor. Mr. Mejia's estimate was five minutes, and that's the best we can do. But what we know is that this is a one-story house and that Mr. Mejia was gotten up off the ground as soon as the sweep of the house was completed. I don't think that took five minutes, but that was Mr. Mejia's estimate, and that's the only number that's been put on this, and so we've got to live with that. But suffice it to say that as soon as the officers were finished sweeping the house, realized that there was no other person in the house, Mr. Mejia was stood up. The officer that was with Mr. Mejia during the sweep was also talking with him and learned that he was Mejia and not Marty, and indeed learned that Marty had sold the house to Mejia during that detention time. As soon as they got Mr. Mejia up, they took the handcuffs off him, explained to him the situation. I think Officer Hinz and one of the probation officers stayed there to talk to Mr. Marty and explain, and all the rest of the officers were directed to get out of the guy's house because they wanted to stop the intrusion as quickly as they could. Is there a factual dispute about whether or not the officers announced before they broke open the door? Your Honor, first of all, I would like to point out that the door was not broken open, and I think that's a critical factor in this case. Entry was, there was a push through the door after Mr. Mejia. There's no damage to the door? Well, there's some incidental damage. Somebody kicked the door on the outside as he was going through, and I think that somebody else back in the line pulled the screen door to get through and damage that. But the latch on the door was undamaged. The hinges on the door were undamaged. The door was not kicked from its lodging in the building. Okay. Back to the announcement part. The announcement part, Mr. Mejia says he did not hear any announcements. The officers all say that there were announcements made prior to the door being opened, and on top of that, Officer Hens, as the door was opened, as Mr. Mejia was undoing the latch and she began to press on the door, was again announcing. So there was, at the very least, a simultaneous announcement and entry. And I think that If we draw an inference in his favor, as we're supposed to do at this stage of the game, couldn't we conclude that if he didn't hear an announcement that he should have heard that there was no announcement made? I think that's a possible conclusion that the Court could make. And I think it might not be inappropriate under summary judgment circumstances. However, what we're dealing with here is also, I think, an exigency situation. We're dealing with officers who are out to make a warrant arrest on a man who was taken out of that very house for the act of possessing shot – sawed-off shotguns and machine guns, which, indeed, he was protecting with a loaded firearm that was close at hand when the officers entered that house under that arrest situation. And these officers knew those facts when they went in. And so I think that it was fair for them to conclude that there was a danger of this person having weapons inside the house when they entered, and it created an exigency which I think justified a simultaneous entry if the Court concludes that there was not, for summary judgment purposes, a prior announcement. Judge Grieber, anything? No more questions. Justice, thank you. Thank you very much. Thank you, Your Honor. You bet. If I could address these as fast as possible. The own – they said they had no idea who was there. Their own records show that the only contact at this address for the last year was Mr. Mejia and his wife. Their own records. I produced those in my brief. Had they bothered to look at their own records, they would have seen that Marty hadn't been there for some time and that Mr. Mejia was. They said that they let him go when they determined it was no longer a threat. That's not what they testified to. The evidence is that when the officer came in and said, gee, I ran the plates, we got the The Robertson decision keyed on the fact that they were putting the innocent person in danger. It didn't matter – it wasn't based upon how long the guns were on their head. It was the fact that they were on the person's head. They said it's inherently unreasonable in the absence of escape or resistance to put people in danger because of the possibility of accidental discharge. That's in this court's own opinion in Robertson that I quoted. So it's not like you can put them in danger and actually discharge for five seconds, but if you do it for three minutes, you've crossed the line. Let's assume they had the right house. Let's assume this was Al Marty's house and Al Marty was living there. Are you saying that police officers cannot enter a home with their guns drawn to execute a warrant on somebody who has a conviction for possession of a sawed-off shotgun? I'm not saying that. The cases I cited in briefs hold that, that that is insufficient as a matter of law to come in armed, drawn, guns at people's head if that's the only thing you have. I can't remember the case off the top of my head. It's in my brief. It very specifically goes to that. It's something that happened in the past. Okay? The apprehension here was created by a fabrication. The defendant's own testimony was that Hintz told them they were arresting him for possession of a machine gun. Well, of course they're got, these officers are all hyped up thinking this guy's got a machine gun. In fact, the arrest, and the record clearly demonstrates, was because he didn't complete a work program. It had the, the, the officer that was giving the briefing, Officer Hintz, given the correct information, were trying to pick up this guy because he didn't complete his work program, it might have been a whole lot of different state of mind in the officers than if she falsely said, oh, then we're picking him up for possession of a machine gun. And I cited specific cases. What do they need to go into a house with guns drawn? They need some probable cause to believe that guns are necessary. Okay. And they say they have a probationer that the probation department hasn't even bothered to contact for a year. He's on probation for what? For some armed violations. That's why I cited those cases. Obviously, his arms were taken away from him at the time that he was convicted. Well, they're supposed to be. And he's supposed to be on probation with regular checks to make sure he doesn't rearm himself. And he absconded. They didn't do that either. But he absconded from probation. Pardon? He absconded from probation. I don't know if he absconded, he just didn't complete his work program. Well, not only that, but he moved and didn't leave the, leave a new address. Yes. A common fact known well to these officers, which is exactly why their search manual says you have to double-check recent records within 24 hours on the utilities to make sure the guy is still there. But why, what is the purpose of having, going through the facade and the farce of having a search manual if they routinely just ignore virtually every provision applicable to the situation? I mean, when I say ignore, I'm meaning that in the literal sense they were either ignorant, saying, well, we never trained on that, or, well, yeah, nobody does that. I mean, what's the, it's just a farce to have a search manual if they're going to violate numerous provisions and then come to court and say, well, we were all in good faith. I mean, I submit you can't be in good faith as a police officer when you not only violate your own search manual, ignore the records in your own computer that says Marty's at another address, ignore the records showing in your own computer the only person we've had contact in this house for the last 10 or 12 months is Mr. Mehe and his wife, and yet they kick the doors down and stick guns in my guy's head. I think that's inherently unreasonable, and the whole thing under the Fourth Amendment is a balancing test of where potentially reasonable action crosses the line and becomes unreasonable. So I think that line was clearly crossed in this case. Mr. Greenberg, do you have any more questions? Thank you to all gentlemen. The cases are just submitted.
judges: Hall, Silverman, Graber